FEDERATED CONSERVATIONISTS OF WESTCHESTER COUNTY, INC., Citizens for Parklands, Patricia Barr, Thomas N. Barr, Jr., Val. J. Codina, and Sol Weinberg, Plaintiffs,

v.

CITY OF YONKERS, County of Westchester, Hon. Andrew J. Spano, Westchester County Executive, and State of New York, Defendants.

No. 00 Civ. 6826(LBS).

United States District Court, S.D. New York.

Oct. 17, 2000.

372

J. Henry Neale, Jr., White Plains, NY, for plaintiffs.

Kevin J. Plunkett, Thacher, Profitt & Wood, Alan M. Natchev, Raymond Fitzpatrick, White Plains, NY, for City of Yonkers.

Alan D. Scheinkman, Westchester County Attorney, White Plains, NY, Thomas J. Schrempf, Irma W. Cosgriff, Assistants County Attorney, for City of Westchester.

Eliot Spitzer, Attorney General of the State of New York, New York City, Stephen M. Jacoby, Robert Blum, Assistants Attorney General, for State of New York.

## OPINION

SAND, District Judge.

Plaintiffs commenced this action in New York Supreme Court on August 22, 2000 seeking declaratory and rescissory relief as to Defendants' conduct concerning a 4.21 acre tract of de-dedicated parkland situated inside Yonkers, New York. Defendant City of Yonkers ("the City")--with the consent of Defendants County of Westchester and Andrew J. Spano, Westchester County Executive (collectively "the County Defendants") [1]--filed a timely notice of removal to this Court, pursuant to 28 U.S.C. § 1446. Thereafter, the County Defendants cross-claimed against the City on issues essentially parallel to those advanced by Plaintiffs, the chief difference being that the County Defendants have requested equitable relief only in the form of specific performance.

Presently before the Court is Plaintiffs' motion to remand, filed pursuant to 28 U.S.C. 1447(c). Following a court-expedited hearing on September 26, 2000, at which all parties were present, the motion became fully submitted and decision was reserved. The Court now concludes, for the reasons set forth below, that:

(1) Removal to this Court was both necessary and appropriate under the All Writs Act, 28 U.S.C. § 1651(a);

(2) Plaintiffs lack standing to sue as third-party beneficiaries to the Intermunicipal Agreement executed between the City and Westchester County--and thus Plaintiffs' contract cause of action must be dismissed by the Court, sua sponte, for failure to state a claim upon which relief can be granted;

(3) All Writs Act provides basis for the Court's issuance of a permanent injunction that henceforth enjoins Plaintiffs, their successors and assigns, and all persons with actual knowledge of the injunction, from challenging the use of the Grassy Sprain site for housing purposes; and

(4) Plaintiffs' two remaining state-law claims should be remanded to New York Supreme Court for further adjudication not inconsistent with the Court's rulings herein.

## I. BACKGROUND

The background of this case is inextricable from that of another also within the Court's active docket: *United States v. Yonkers Board of Education*, 624 F.Supp. 1276 (S.D.N.Y.1985). Since the events and dramatis personae in both significantly overlap, Plaintiffs' Complaint is best viewed against the backdrop of the Court's continuing, fifteen-year effort to further the desegregation of subsidized housing in the City of Yonkers. Familiarity with this history is presumed, though we briefly restate those facts which are germane to the matter presently before the Court.

## A. RACIALLY SEGREGATED HOUSING IN THE CITY OF YONKERS: *U.S. v. YONKERS*

In 1980, the United States Department of Justice filed a civil rights suit against the City of Yonkers, the Yonkers Board of Education, and the Yonkers Community Development Agency, charging that the defendants had unlawfully segregated by race the City's subsidized housing programs and public schools. This Court, in 1985, found the existence of a pattern and practice of intentional discrimination by City officials with respect to both housing, *see U.S. v. Yonkers Bd. of Educ.*, 624 F.Supp. 1276, 1376 (S.D.N.Y.1985) ("In sum, the record clearly demonstrates that race has had a chronic and pervasive influence on decisions relating to the location of subsidized housing in Yonkers."), and schools, *see id.* at 1544 ("[T]he City's housing practices, the mayoral appointment of Board members, and other City involvement in school affairs are more than ade-

1. Defendant State of New York is a nominal party to this action.

quate evidence of the City's intentional perpetuation and exacerbation of racial segregation in Yonkers public schools."). The Court of Appeals affirmed, see 837 F.2d 1181 (2d Cir.1987), and the Supreme Court denied certiorari, see 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

Having ruled that the three City defendants stood liable for rampant and recurring civil rights violations, this Court quickly moved to the remedial phase of trial during the next year. The ensuing struggle to further the desegregation of the City's subsidized housing program continues to this very day,[2] and it is from that protracted story that the events most relevant to Plaintiffs' claims at bar arise. Beginning with the Court's very first attempt to remedy the unconstitutional housing situation in Yonkers, see U.S. v. Yonkers, 635 F.Supp. 1577, 1580–1581 (S.D.N.Y.1986) (entering Housing Remedy Order), aff'd, 837 F.2d 1181 (2d Cir.1987), cert. denied, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988), a paramount goal has always been the creation of new subsidized housing in predominantly white East and Northwest Yonkers.

B. THE GRASSY SPRAIN SITE: COURT–ORDERED CONSTRUCTION OF NEW SUBSIDIZED HOUSING

Of the many remedial construction obligations imposed by the Court upon the City of Yonkers since entry of its original 1986 Housing Remedy Order, one required the City to designate a suitable site in Northeast Yonkers sufficient to erect "34 units of housing, at least half of which shall

be affordable."[3] Second Supplemental Long Term Plan Order ("SSLTPO") ¶ 4, U.S. v. Yonkers (filed Nov. 6, 1996). If the City failed to make such a designation within one month of the Court's November 6, 1996 order, a northeast site known as "School 15" would automatically be made available for integrative housing purposes–despite the fact that the Yonkers Board of Education sought the School 15 site for its own use in furtherance of court-mandated school desegregation. See City of Yonkers Mem. in Supp. of Use of School 15 Site for School Deseg. Purposes, U.S. v. Yonkers (filed Aug. 9, 1996).

On December 5, 1996, the City timely designated the "East Grassy Sprain Road Site" ("the Grassy Sprain site") as its alternative Northeast Yonkers locale for new housing construction. See City of Yonkers Designation of Housing Site Pursuant to Para. 4 of Second Supplemental Long Term Plan Order, U.S. v. Yonkers (filed Dec. 5, 1996). However, the Court required that two additional steps be taken before it would grant final approval of the Grassy Sprain site: (1) because the Grassy Sprain site constituted part of Rory O'Moore Park, a city recreation area, the site needed to be properly de-dedicated as public parkland before it could be used for non-park purposes; and (2) a detailed study of the suitability of the site for subsidized housing had yet to be conducted by the parties. See U.S. v. Yonkers, 1997 WL 4585 (S.D.N.Y. Jan.7, 1997). Both conditions were eventually met to the satisfaction of the Court, and on June 25, 1997, the Grassy Sprain Site received the

---

**2.** Of course, judicial remedies were also ordered and instituted with respect to the segregated schooling aspects of U.S. v. Yonkers, but we omit discussion of them here as ancillary to the present case. In no way, however, is that tangled history any less significant.

**3.** The term "affordable housing" was defined as "units which persons at between 0–100% of Westchester County median income can rent or purchase by expending no more than 30% of their gross annual household income (or such higher percentage as permitted by

the applicable housing finance program)." SSLTPO ¶ 5, U.S. v. Yonkers (filed Nov. 6, 1996). This category of housing was to be distributed as follows: "30% for households earning less than 50% of Westchester County median income; an additional 45% for households earning between 50 and 80% of Westchester County median income; and an additional 25% for households earning between 80–100% of Westchester County median income." Id.

Court's final approval for new construction of 34 units of subsidized housing. *See* Order, *U.S. v. Yonkers* (filed June 25, 1997).

Although actual construction on the Grassy Sprain site still has not commenced, considerable time, effort, and resources have been expended toward that end. Thus far, a private developer has been retained, City funds have been committed, and the New York State Affordable Housing Corporation has recently awarded a $425,000 grant to the project. Approval of a further $510,000 in Westchester County funds is currently pending before the County Board of Legislators. At the same time, however, nearly three years has passed without a single subsidized housing unit being built in East Yonkers.[4]

## C. THE GRASSY SPRAIN SITE: THE PROCESS OF PARKLAND ALIENATION

Having sketched out the wider context of this dispute, we now provide a more detailed description of the process by which the Grassy Sprain site was made available for non-park utilization, included the specific events that give rise to Plaintiffs' claims.

In December 1996, when the City of Yonkers designated the Grassy Sprain site for court-ordered new housing construction, the site still constituted part of Rory O'Moore Park. The park had been held as a public recreation area by Westchester

County from 1927 until 1962, *see* Compl. ¶ 21, and by the City from 1962 onwards, *see* Compl. ¶ 22. In March 1963, deed to the park was officially transferred from the County to the City, *see* Compl. ¶ 23, subject to the condition that the land would revert to the County should it not be used "solely and exclusively for park and recreation purposes," Compl. ¶ 26.

Thus, in order for the City to use the Grassy Sprain site for subsidized housing in accordance with this Court's remedial orders in *U.S. v. Yonkers*, two actions were required. First, the site needed to be de-dedicated as public parkland by the New York State Legislature, as per New York law. And second, the County's reversionary interest in the site needed to be extinguished. The City set about accomplishing both these tasks.

### 1. *Legislative Parkland De–Dedication*

On December 17, 1996, the New York State Legislature passed a bill (S.7982–A) that authorized the City of Yonkers to de-dedicate the Grassy Sprain site as public parkland. *See* 1996 N.Y. Laws 728. Section 1 of the bill permitted the de-dedication "provided such lands are made available and utilized as a site for affordable housing in compliance with the order of the United States District Court for the Southern District of New York in *U.S. v. Yonkers*, 80 Civ. 6761." *Id.* § 1. Section 2 conditioned the authorization of de-dedication on the proviso that the City "shall dedicate replacement lands of equal or

---

4. The Court's housing remedy in *U.S. v. Yonkers* had three major components: (1) construction of public housing (completed and occupied); (2) utilization of vacant existing housing units for subsidized housing purposes (ongoing); and (3) construction of four housing complexes on scattered sites in East Yonkers, each containing both market rate and subsidized units. The Grassy Sprain project is one of those complexes included in the third category above. As to the remaining three complexes, one is presently under construction (Cross Street) and it is expected that the other two will soon commence construction as well (Hoover Road, Yonkers Avenue).

In light of previous experience garnered with respect to the relative rates of construction progress on the School 15 and East Yonkers affordable housing sites, this Court ordered that construction not commence at the Yonkers Green site–not part of the Court's housing remedy order–until the four East Yonkers sites were also under construction. Yonkers Green is a privately sponsored, subsidized housing project that will be built in an area of Southwest Yonkers (which is predominately minority).

greater 'fair market value for park purposes." *Id.* § 2. The bill was signed into law by New York's Governor on January 30, 1997. *See id.*

### 2. *Quitclaim Deed*

On April 25, 1997, the Westchester County Board of Legislators authorized a quitclaim conveyance of the Grassy Sprain site from the County to the City. *See* Act No. 64–1997, Westchester County Board of Legislators. That legislation additionally authorized the County to enter into an Intermunicipal Agreement ("IMA") with the City that would, inter alia, require the City to "dedicate at least twenty-five (25) additional acres to the existing park system of the City of Yonkers." *Id* § 2.

It is at this point in the time line–subsequent to the requisite State and County legislative approvals, but prior to actual execution of the IMA or quitclaim deed conveyance–that this Court found sufficient certainty in the availability of the Grassy Sprain site for new housing construction that we released the alternative School 15 site to enable construction of the contemplated school. *See* Order, *U.S. v. Yonkers* (filed June 25, 1997).

The terms of the eventually-agreed-upon IMA require the County to transfer the Grassy Sprain site by quitclaim deed subsequent to the IMA's "full execution," *see*

IMA ¶ 3 (available in City Def.'s Notice of Removal Ex. A.), while the City must in turn add 25 extra acres of parkland inside Yonkers within 60 days of the IMA's execution, *see id.* ¶ 1. Though both parties gained legislative approval of the IMA in Spring 1997, *see* City Def.'s Answer ¶ 8, physical signing of the document by both sides was not fully effected until May 25, 2000, *see* County Defs.' Answer & Cross-cl. Ex. K.[5]

At last, on May 25, 2000, the quitclaim deed to the Grassy Sprain site was formally conveyed to the City, *see* Compl. ¶ 48, thereby releasing the County's reversionary interest in the land and permitting the site to be used for the construction of new subsidized housing, as required by the housing desegregation remedy imposed by this Court in *U.S. v. Yonkers.*

### D. THE INSTANT CASE

#### 1. *Parties*

Federated Conservationists of Westchester County, Inc. ("FCWC") is a New York not-for-profit corporation that has operated out of White Plains for more than 35 years. *See* Compl. ¶ 2. Full membership in FCWC is open to "all persons concerned with the preservation of open space and the wise use of the natural

5. The parties disagree as to the date on which the IMA should be considered to have been "executed." Plaintiff and the County Defendants view the date of execution as May 25, 2000–the day the County physically signed the IMA document (the City had signed the IMA at some earlier date in 1998, *see* City Def.'s Ex. 1 from Sept. 26, 2000 Hr'g). *See* Compl. ¶ 46; County Defs.' Answer & Cross-cl. Ex. K. On the other hand, the City considers the IMA to have been executed when it was approved "by action of the County Legislature on April 25, 1997 and by action of the City Council of Yonkers by Res. 173–1997 adopted on June 24, 1997." City Def.'s Answer ¶ 8. The significance of this interpretive disagreement boils down to the following question: Did the City's obligation to dedicate 25 acres of additional parkland, pursuant to paragraph 1 of the IMA, begin on May 25, 2000 or June 24, 1997?

Additionally, the City contends that it has already fulfilled its obligation to dedicate 25 acres of extra parkland by means of Special Ordinance 1–1998, approved by the Yonkers City council on January 4, 1998, and signed by the Mayor on January 20, 1998. *See* Tr. Sept. 26, 2000 Hr'g at 32–37. This ordinance supposedly amended the map of Yonkers to include approximately 26.156 of new parkland. Plaintiffs and the County assert that a large portion of the acreage detailed in the Special Ordinance had already been parkland prior to both the passage of the Ordinance in 1998 and the approval of the IMA in 1997. As such, Plaintiffs and the County argue that the Special Ordinance parcels do not satisfy the "additional parkland" requirement of the IMA. *See* Tr. Sept. 26, 200 Hr'g at 11–12; County Defs.' Answer & Cross-cl. ¶ 78. We do not reach the merits of these disputes.

resources of Westchester County." *Id.* ¶ 3. As of this year, FCWC is comprised of approximately 350 individuals and 60 organizations, all of which pay dues. *See id.* Apparently, FCWC members and their families "frequently use" the dedicated parklands and public spaces within Westchester County–ranging from the County to the village level–for their own "active or passive recreation." *See id.*

Citizens for Parklands ("CFP") is an unincorporated association founded in December 1996. *See id.* ¶ 5. Operating out of Yonkers, CFP directs itself to the purpose of "advocating the preservation and protection of dedicated parklands within the City of Yonkers and elsewhere in Westchester County." *Id.* Included in its open membership rolls are "representatives of approximately 75 households situated primarily at various locations in Northeastern Yonkers." *Id.* CFP members and their families claim to be "regular" visitors to the parklands at issue in this action, and wish to continue making more of such visits in the future. *See id.*

Patricia Barr, Thomas N. Barr, Jr., Val J. Condina, and Sol Weinberg are all residents of Yonkers who live "in the immediate vicinity of the parklands that are the subject of this action." *Id.* ¶¶ 7–9. Plaintiffs Barr and Weinberg are also members of the CFP executive committee; Plaintiff Condina is vice-chairman of CFP. *See id.*

There are four defendants in the instant case: the City of Yonkers ("the City"), the state of New York, the County of Westchester, and Andrew J. Spano, the Westchester County Executive. Because the latter two share counsel, we refer to them collectively as "the County Defendants." The State of New York is a nominal party.

### 2. *Prior State Court Action: Federated I*

On May 21, 1997, all six of these same plaintiffs filed an earlier action in New York Supreme Court against the City of Yonkers, Westchester County, and the Westchester County Board of Legislators:

*Federated Conservationists of Westchester County, Inc. v. County of Westchester,* No. 8527/97 *("Federated I"). See* Compl. ¶ 14. In that prior action, Plaintiffs sought declaratory relief with respect to the de-dedication and quitclaim conveyance efforts surrounding the Grassy Sprain site. More specifically, judicial declarations were requested concerning, inter alia, the following two questions:

First, had the City complied with the terms of chapter 728 of New York's 1996 session laws ("the State Act")? This is the legislation–summarized in Subsection I.C.1 *supra* –that authorized the City to de-dedicate the Grassy Sprain site as public parkland, and that required the City to dedicate replacement parklands of equal or greater fair market value.

Second, had the City complied with the terms of Act No. 64–1997 adopted by the Westchester County Board of Legislators on April 25, 1997 ("the County Act")? As described *supra* in Subsection I.C.2, the County Act authorized the conveyance of a quitclaim deed by the County to Yonkers as a means of extinguishing the County's reversionary interest in the Grassy Sprain site. The County Act further authorized the County to enter into an Intermunicipal Agreement ("IMA") with the City that would require the City to dedicate an added 25 acres of parkland to Yonkers' existing park system.

Additionally, Plaintiffs requested that the state court–upon a finding of noncompliance by the City with respect to either of the queries above–declare the County Act "null and void, unenforceable and of no effect."

The three defendants in the prior action moved to dismiss the complaint for lack of standing, lack of subject matter jurisdiction, and failure to state a cause of action. The City moved for summary judgment on similar grounds.

Justice Joan B. Lefkowitz of New York Supreme Court, County of Westchester,

issued a decision filed on August 6, 1997, together with an amended order filed on September 17, 1997. Justice Lefkowitz concluded that Plaintiffs had standing, that the court retained subject matter jurisdiction, and that Plaintiffs had stated sufficient causes of action.

However, Justice Lefkowitz also ruled that Plaintiffs' challenges under both the State and County Acts were premature. First, the State Act failed to indicate that time was of the essence with respect to the City's obligation to dedicate equivalent parkland; the City was thus entitled to a reasonable performance period and such period had not yet passed. Second, the County Act itself contained no requirement that the City dedicate 25 added acres of parkland; the Act merely *authorized* the execution of an IMA that would *in the future* impose such an obligation.

In short, the prior state court action made clear that Plaintiffs' claims–which plaintiffs had standing to assert, which were cognizable, and over which the court held subject matter jurisdiction–would each remain unripe until either (1) a reasonable performance period had passed under the State Act, or (2) an IMA was actually executed between the City and County. No aspect of Justice Lefkowitz's ruling in *Federated I* was ever challenged on appeal. *See* Compl. ¶ 18.

### 3. *Present Action*

On August 22, 2000, Plaintiffs returned to press their claims once again with a new complaint filed in New York Supreme Court. Again Plaintiffs seek relief with respect to alleged procedural improprieties of parkland de-dedication and quitclaim conveyance. The State of New York and the Westchester County Executive have been added as defendants, whereas the County Board of Legislators has been omitted.

In this Complaint, Plaintiffs ask for judicial declarations concerning two issues. The first is duplicative of the prior state court action–i.e., whether the City of Yonk-

ers has complied with the State Act's requirement that equivalent replacement parkland be dedicated in place of the Grassy Sprain site. *See* Compl. at 17. This claim had been previously dismissed as premature by Justice Lefkowitz. *See Federated I.*

The second, however, is entirely new: whether the City has complied with the terms of the IMA executed between City and County. *See* Compl. at 17. In return for conveyance of the quitclaim deed regarding the Grassy Sprain site, the IMA mandates that the City dedicate at least 25 acres of additional parkland to the existing Yonkers park system within 60 days of the IMA's execution. Plaintiffs never sued under the IMA in the prior action before Justice Lefkowitz. *See Federated I.* Indeed, back in May 1997, the IMA had not even been signed by both the City and County. *See* County Defs.' Answer & Cross-cl. Ex K.

And most significant for purposes of federal concern–instead of asking that the County Act be adjudged "null and void" as the requested means of relief (as was the case in Plaintiffs' earlier action, *see* Plts.' Mot. to Remand Ex. B), this time the Plaintiffs seek equitable rescission of the quitclaim deed conveyance of May 25, 2000, *see* Compl. at 17, and a permanent prohibition on all non-park uses of the Grassy Sprain site, *see* Compl. at 18.

### 4. *Procedural Posture*

Defendant State of New York answered the Complaint in New York Supreme Court on September 6, 2000. Pursuant to 28 U.S.C. § 1446, the City of Yonkers filed a timely notice of removal to this Court on September 11, alleging federal jurisdiction under 28 U.S.C. §§ 1441 and 1443, as well as the All Writs Act, 28 U.S.C. § 1651(a). Both County Defendants consented to the removal.

On September 12, this Court ordered that a hearing be held on September 26, at which time all parties would be able to

present motion papers or other evidence, if so desired. Order, *Federated Conservationists of Westchester County, Inc. v. City of Yonkers*, 00 Civ. 6826 (2000). At the hearing, Plaintiffs acknowledged that they sought no delay and had no desire to make any further submissions to the Court. *See* Tr. Sept. 26, 2000 Hr'g at 40–41.

Prior to the hearing, on September 22, the County filed an Answer, as well as a Cross–Claim against the City that essentially tracks Plaintiffs' Complaint–except that the County Defendants' requested relief seeks specific performance of the IMA, not rescission of the quitclaim deed. The City filed its Answer to the Complaint on September 25.

At the September 26 hearing, Plaintiffs submitted the instant motion to remand, pursuant to 28 U.S.C. § 1447(c). Plaintiffs argue that neither the federal removal statutes nor the All Writs Act, 28 U.S.C. § 1651(a), confers subject matter jurisdiction upon this Court over the instant action. Plaintiffs additionally move for a preliminary injunction that bars any non-park use of the Grassy Sprain site, pending remand or final resolution on the merits.

During the hearing, the City orally moved this Court to enjoin Plaintiffs from seeking relief that would interfere with the City's efforts to comply with the remedial housing orders of *U.S. v. Yonkers*, and then to subsequently remand the remaining state law claims to New York Supreme Court for adjudication on the merits. *See* Tr. Sept. 22, 2000 Hr'g at 32, 36.

Plaintiffs' motion to remand became fully submitted at the close of the hearing, whereupon the Court reserved decision. The Court further directed the parties, within two weeks of the hearing, to engage in a face-to-face meeting in order to attempt to resolve the matter consensually. The parties were ordered to apprise the Court of the result of that meeting, and we have been notified in writing by counsel for Plaintiffs and the City that no consensual resolution has been achieved. As such, the Court now proceeds to decide the several issues presently before it.

## II. DISCUSSION

### A. MOTION TO REMAND

The City removed to this Court based on 28 U.S.C. §§ 1441 and 1443, as well as the All Writs Act ("the AWA"), 28 U.S.C. § 1651(a). Plaintiffs contend that not one of these three statutes is a correct basis for removal. Because we readily conclude that the instant action was appropriately removed under the AWA, Plaintiffs' motion to remand must be denied.[6]

■ The AWA provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Second Circuit has laid out the applicable standard for removal under the AWA: "[A] district court may remove a state court action where 'removal was necessary to protect the integrity of [a] consent decree' and where 'the issues raised by the state court action cannot be separated from the relief provided by the consent decree.'" *U.S. v. City of New York*, 972 F.2d 464 (2d Cir.1992) (quoting *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 865 (2d Cir.1988), *cert. denied*, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989)).

■ There is no question that allowing Plaintiffs' action to proceed in state court unduly jeopardizes this Court's remedial orders in *U.S. v. Yonkers*. In their Complaint, Plaintiffs seek to bar all non-park uses of the Grassy Sprain site, including residential development. *See* Compl. at 18. That site, however, had already been designated in 1996 for new housing construction in accordance with this Court's

---

**6.** Having found that the All Writs Act supports removal in this case, we do not reach the question of removal under either 28 U.S.C. §§ 1441 or 1443.

desegregation directive in *U.S. v. Yonkers*. *See* City Def.'s Notice of Removal ¶ 5. A state court judgment that eliminated Grassy Sprain as a site for housing utilization–nearly four years after the site's designation for housing–would seriously impede implementation of the housing remedy order. The Court, the City, and all other involved parties in *U.S. v. Yonkers* would then be forced to start all over again the incredibly politicized, controversial site designation process. The longer the day is forestalled when units of affordable housing are constructed in predominantly white sections of Yonkers, the farther away slips the ultimate goal of a meaningful remedy for the members of the plaintiff class in *U.S. v. Yonkers*. Accordingly, removal of Plaintiffs' instant state action is both necessary and appropriate to protect the integrity of the remedial housing orders of this Court in *U.S. v. Yonkers*.

Plaintiffs raise three counter-arguments against removal: (1) Justice Lefkowitz's unchallenged finding of state court subject matter jurisdiction in Plaintiffs' prior action stands as "law of the case;" (2) *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855 (2d Cir.1988) is inapposite; and (3) the All Writs Act does not confer an independent basis for federal jurisdiction. *See* Neale Aff. in Supp. of Mot. to Remand at 3–11; Plts.' Mem. in Supp. of Mot. to Remand at 2–4. All three of Plaintiffs' contentions are without merit.

### 1. *Prior State Court Finding of Subject Matter Jurisdiction as "Law of the Case"*

■ In a prior state court action between Plaintiffs and two of the defendants in this case, Justice Lefkowitz ruled that her court held subject matter jurisdiction over Plaintiffs' claims. *See Federated I.* Because that prior action involved similar parties and similar claims–and because Justice Lefkowitz's decision was never challenged on appeal by any of the parties–Plaintiffs submit that this Court is somehow precluded from finding federal subject matter jurisdiction with respect to the instant cause of action. Plaintiffs mystically refer to the state court's earlier jurisdictional ruling as "law of the case." *See* Neale Aff. in Supp. of Plts.' Mot. to Remand at 6–9; Tr. Sept. 26, 2000 Hr'g at 9. This is plainly wrong.

To begin, the doctrine of "law of the case" applies to the binding effect of an earlier appellate decision in a case on a subsequent appeal in that same case. Such a situation is far afield from the one present here. Nevertheless, technical legal labels aside, Plaintiffs obviously intended to make the argument that Justice Lefkowitz's prior determination relating to subject matter jurisdiction in turn bars a finding of federal subject matter jurisdiction by this Court. That is, once the state court found jurisdiction, no federal court can subsequently claim it too.

Plaintiffs' argument, of course, assumes that the two cases at issue are sufficiently related or similar that principles of collateral estoppel should apply. Yet it is clear that Plaintiffs' instant action raises issues not included and never litigated in Plaintiffs' earlier state court matter. Plaintiffs' 1997 state court action sought declaratory relief with respect to two legislative acts, one by the State of New York and another by Westchester County. *See* Plts.' Mot. to Remand Ex. B. In the instant case, however, Plaintiffs have sued under the Intermunicipal Agreement between the County and Yonkers. *See* Compl. at 17. Whereas Plaintiffs before sought only to declare a County statute "null and void," they presently request equitable rescission of a quitclaim deed as well as a total ban on nonpark use of the Grassy Sprain site. The substantive differences between these two cases are enough to permit this Court to determine subject matter jurisdiction on its own and in the first instance.

### 2. *The Yonkers Racing Decision as Inapposite*

Plaintiffs attempt to distinguish the situation present in this case from that at issue in *Yonkers Racing Corp. v. City of*

*Yonkers,* 858 F.2d 855 (2d Cir.1988), *cert. denied,* 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989)–a case heavily relied upon in the City's Notice of Removal. *See* Plts.' Memo. in Supp. of Mot. to Remand at 2–3; *see also* Tr. Sept. 26, 2000 Hr'g at 10, 19. Plaintiffs depict their instant claims as focusing purely on the process of parkland alienation, whereas *Yonkers Racing* is supposedly concerned with site selection pursuant to a federal remedy order. This is an empty distinction, if one at all. Plaintiffs' Complaint seeks to rescind the quitclaim deed executed between the County and City, and to prohibit all nonpark uses of the Grassy Sprain site. *See* Compl. at 17. Such relief, if granted, inevitably impacts site selection in *U.S. v. Yonkers.* Not only will the designated housing site be challenged and voided, all parties will be forced to begin the tortuous selection process anew.[7]

Nor is *Yonkers Racing* the only Second Circuit decision that affirms a district court's removal of a state action pursuant to the All Writs Act. In *U.S. v. City of New York,* 972 F.2d 464 (2d Cir.1992), Judge Mishler in the Eastern District of New York removed to his court a state Article 78 proceeding that threatened the integrity of a federal consent decree over which he concurrently presided. In 1989, New York City had entered into a federal decree with the U.S. Environmental Protection Agency for the purpose of ending the city's ocean dumping of wastewater. *See id.* at 466. One provision in the decree required the city to execute contracts for interim land-based management of sewage sludge. After three such contracts gained final approval, a city taxpayer named Carolyn Maloney brought a separate Article 78 proceeding in state court seeking to void the contracts due to alleged irregularities in the bidding process. *See id.* at 467.

On review, the Second Circuit agreed with the district court, ruling that Maloney's petition raised issues linked with the relief ordered in the consent decree–i.e., the need for sewage management contracts–and, if successful, would ultimately jeopardize the prior decree. *See id.* at 469. As such, concluded the panel, removal under the All Writs Act was entirely appropriate.

Both *U.S. v. City of New York* and *Yonkers Racing* are clear, controlling authority for this Court's decision that removal of Plaintiffs' state action to this Court is appropriate under the All Writs Act. A third-party has filed suit in such a way as to threaten the integrity of an extant federal remedy order. Removal of that case is necessary and appropriate to ensure the continued efficacy of the Court's remedial jurisdiction in the civil rights matter of *U.S. v. Yonkers.*

### 3. *AWA Not an Independent Basis for Federal Jurisdiction*

■ By arguing that the All Writs Act affords no independent basis for federal jurisdiction and that "it merely provides a tool courts need in cases over which jurisdiction is conferred by some other source," *see* Memo. in Supp. of Plts.' Mot. to Remand, Plaintiffs demonstrate their ill grasp of the doctrine. The AWA provides that a federal court may "issue all writs necessary or appropriate in aid of *their respective jurisdictions.*" 18 U.S.C. § 1651(a) (emphasis added). With respect to the removal of a state case that conflicts with a federal remedy order, the "respective jurisdiction" that is being aided is the court's continuing jurisdiction over the federal case from which the remedy order emanated. This simply means that the AWA contemplates the involvement of at least two distinct cases: one that is being

---

7. *See supra* note 4 and accompanying text.

We also question Plaintiffs' one-dimensional characterization of *Yonkers Racing.* It is true that site selection was at issue there, but the real points of controversy were the condemnation proceedings initiated *in order to*

*effect site selection. See* 858 F.2d 855, 859. In this light, *Yonkers Racing* is quite comparable to the instant situation insofar as Plaintiffs have challenged the parkland de-dedication and deed conveyances which were similarly undertaken *in order to effect site selection.*

removed, and another already within the removing court's jurisdiction. Removal of the former under the AWA should be necessary and appropriate to protect the latter.

Plaintiffs mistake the above principle for the misguided rule that any state action removed pursuant to the AWA must also be removable on some secondary ground. This is incorrect. Indeed, in both *Yonkers Racing* and *U.S. v. City of New York*, the only grounds for removal found by the appeals court had been the AWA. *See U.S. v. City of New York*, 972 F.2d at 469; *Yonkers Racing*, 858 F.2d at 863 ("[W]e need not resolve the difficult question of [whether removal was appropriate under the removal statutes] since the district court asserted an independent basis for removal jurisdiction under the All Writs Act."); *see also Lucas v. Planning Bd. of the Town of LaGrange*, 7 F.Supp.2d 310 (S.D.N.Y.1998) ("There is an independent basis for federal jurisdiction in the authority conferred by the All Writs Act.") Plaintiffs' third and last counter-argument is therefore rejected.

The Court hereby concludes that removal of the instant action pursuant to the All Writs Act, 18 U.S.C. 1651(a), is appropriate and necessary in order to protect the integrity of the housing remedy orders in *U.S. v. Yonkers*. More specifically, we find that the rescissory and declaratory relief sought by Plaintiffs in state court threatens to jeopardize this Court's long-standing remedial directive that new subsidized housing be constructed in Northeast Yonkers on the Grassy Sprain site. Such construction requires that a quit-claim deed be conveyed from the County to the City, and that the Grassy Sprain site be available for residential development. Plaintiffs' desire to rescind that deed conveyance and bar all non-park use of the Grassy Sprain site warrants this Court's exercise of its removal jurisdiction under the AWA.

## B. STANDING

■ From a consideration of federal subject matter jurisdiction, we now turn to questions of standing. Plaintiffs seek judicial declarations as to the City's compliance with three sources of obligation connected to the Grassy Sprain site: (1) chapter 728 of New York's 1996 session laws ("the State Act"); (2) Act No. 64–1997 adopted by the Westchester County Board of Legislators on April 25, 1997 ("the County Act"); and (3) the Intermunicipal Agreement ("IMA") executed between Yonkers and Westchester County. *See* Compl. at 17. In a prior state court action, Justice Lefkowitz ruled that Plaintiffs had standing to sue under the State and County Acts. *See Federated I.* Plaintiffs' cause of action under the IMA, however, is an entirely new one and thus we are the first tribunal to address the question of standing with respect to this particular contract claim.

Although no actual motion to dismiss based on lack of standing has been submitted by any of the Defendants, all have raised the issue in one fashion or another. *See* County Defs.' Ltr. Submitted Together with its Answer & Cross-cl. at 4–5; County Defs.' Answer & Cross-cl. ¶¶ 63, 65; City Def.'s Answer ¶¶ 20, 22. Furthermore, the Court on its own initiative is empowered to note inadequacies in the Complaint and dismiss it for failure to state a claim upon which relief can be granted. *See Leonhard v. United States*, 633 F.2d 599, 609 n. 11 (2d Cir.1980), *cert. denied*, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Kearney v. Todd L. Smith*, P.A., 624 F.Supp. 1008, 1014 (S.D.N.Y.1985); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 at 303 (2d ed.1990). Sua sponte dismissal is especially appropriate in light of any inadequacies related to standing, a nonwaivable defense. Fed. R.Civ.P. 12(h)(3); *see also Juidice v. Vail*, 430 U.S. 327, 331–332, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977).

When considering dismissal pursuant to Fed.R.Civ.P. 12(b)(6), a district court's function is to "assess the legal feasibility of the complaint." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d. Cir.1980). Dismissal of a claim should be granted when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). We must accept Plaintiffs' well-pleaded factual allegations as true, and construe such allegations favorably to the plaintiff. *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), *cert. denied*, 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994).

Plaintiffs seek a declaratory judgment as to whether the City of Yonkers has complied with the terms of the Intermunicipal Agreement between the City and Westchester County. The IMA requires the City to "dedicate at least twenty-five (25) additional acres to the existing park system of the City of Yonkers within sixty (60) days of the date of this Agreement." *See* City Def.'s Notice of Removal Ex. A. The IMA is, of course, no different from any other binding contract between the City and County.

Nowhere within the Complaint do Plaintiffs allege facts in support of their standing to sue under the IMA. Because Plaintiffs are not parties to the IMA, they may sue thereunder only if they are intended third-party beneficiaries of the IMA. *See Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985). Yet Plaintiffs have averred no affirmative facts in support of such a contention. Plaintiffs merely claim to have visited the parklands at issue in this case, and that they wish to continue making such visits in the future; some even live in the vicinity of the at-issue parklands. *See* Compl. ¶¶ 2–9. Yet, construed wholly in Plaintiffs' favor, these facts are simply not enough to raise even the remote possibility that Plaintiffs are intended third-party beneficiaries of the IMA. Without any evidence that the City's obligation to dedicate 25 added acres of parkland was meant to benefit these Plaintiffs in particular–rather than the public generally, if at all–Plaintiffs amount to nothing more than strangers to the IMA. *See* Restatement (Second) of Contracts § 302 (1981).

Nor is it clear that Plaintiffs could ever present any such evidence. The 25–acre requirement in the IMA is satisfied by the addition of parkland *anywhere* within the City of Yonkers. *See* City Def.'s Notice of Removal Ex. A. As such, it is eminently likely that the IMA was never designed to benefit these Plaintiffs specifically. Of course, one could say that the IMA does redound to Plaintiffs' benefit insofar as more parkland is, generally speaking, always a public good. But, as Justice Cardozo observed:

"More than this ... must be shown to give a right of action to a member of the public not formally a party. The benefit, as it is sometimes said, must be one that is not merely incidental and secondary. It must be primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost."

*H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 159 N.E. 896, 897 (1928).

Plaintiffs make no argument that they are intended third-party beneficiaries under the IMA. The IMA, itself, makes no mention of benefitting Plaintiffs, or even the public generally. *See* City Def.'s Notice of Removal Ex. A. And the County Defendants–the parties to the IMA that negotiated for the 25–acre obligation–have affirmatively represented to this Court that Plaintiffs were not ever considered to be beneficiaries of the IMA. *See* County Defs.' Ltr. Submitted Together with its Answer & Cross-cl. at 4–5. Given such a stark factual picture, even when construed

in a light most favorable to Plaintiffs, there is simply no indication that Plaintiffs have standing to sue under the IMA. Therefore, we must dismiss Plaintiffs' contract cause of action as to the IMA for failure to state a claim upon which relief can be granted.

We further note that there is little relevant authority for the proposition that a third-party beneficiary may seek rescission of a contract over vociferous objection by the actual signatories to the contract. A likely explanation for this gap is the fact that beneficiaries usually *want* the benefits due them in a contract, whereas rescission has the counterintuitive effect of depriving the beneficiary of those very benefits.

Moreover, though parties to a contract may envision that certain third-parties should benefit from the contract, that is a far cry from envisioning that those same third-parties will have unilateral power to undo the whole bargain–no matter the detriment to the signing parties.

Because we conclude that Plaintiffs lack standing to sue for rescission, we do not address on the merits the further question whether, on the facts and circumstances of this case, the equitable remedy of rescission should otherwise be available to Plaintiffs.[8]

## C. PERMANENT INJUNCTION

The City of Yonkers has requested that this Court issue a permanent injunction to protect the availability of the Grassy Sprain site for housing construction. *See* Tr. Sept. 26, 2000 Hr'g at 32, 36. We agree that such an injunction is necessary and appropriate in order to ensure the integrity of the *U.S. v. Yonkers* housing remedy order, and to prevent jeopardizing the overarching goals of that order.

■ Besides removal, the All Writs Act additionally permits district courts to issue injunctions binding non-parties when doing so is "necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. 1651(a); *see U.S. v. Int'l Brotherhood of Teamsters*, 907 F.2d 277 (2d Cir. 1990); *In re Baldwin–United Corp.*, 770 F.2d 328, 335–336 (2d Cir.1985). Injunctions made pursuant to the All Writs Act do not have to satisfy the traditional requirements of Fed.R.Civ.P. 65(d). *See id.* at 338–339. Instead, all that is necessary is that the injunction be "necessary or appropriate" to prevent the frustration of a court's previous remedial order. *See id.*

■ It is vital that the long delayed subsidized housing construction in East and Northwest Yonkers be permitted to proceed unfettered with as little delay as possible. To allow third parties free reign to continuously impede construction is to push farther away the ultimate resolution of *U.S. v. Yonkers*. If the Grassy Sprain site is unavailable for housing utilization, more time (years!) must pass before construction on a suitable substitute site becomes a reality. Moreover, other elements of the Court's myriad housing relief may suffer interruption and delay as the overall time line falls apart.[9] To that end, the Court concludes that a permanent injunction is appropriate and necessary to secure the availability of the Grassy Sprain site. It should simply not be the case that today–four years since the site passed a rigorous and contentious approval process–third parties should be free to force a complete reversal of efforts. This is especially unacceptable given that the relief in *U.S. v. Yonkers* aims to reverse a pattern and practice of constitutional violation associated with intentional discrimination by race.

As to the scope of the injunction, we follow Judge Brieant's lead in the case of *Lucas v. Planning Board of the Town of*

---

8. Factors to be considered in that regard would include, inter alia, the extent of reliance on the transaction; and the time, effort, and resources dedicated to planning and se-

curing funding for the Grassy Sprain housing project.

9. *See supra* note 4 and accompanying text.

*LaGrange,* 7 F.Supp.2d 310 (S.D.N.Y. 1998). There, the district court removed a state Article 78 proceeding that threatened a consent judgment concurrently within the court's jurisdiction. The consent judgment arose out of two cellular telephone companies' efforts to construct cell towers in Lagrange, New York. Under the terms of the consent judgment, Lagrange permitted the towers to be built in return for certain height concessions by the phone companies. Subsequent to entry of the consent judgment before Judge Brieant, various residents of Lagrange brought an Article 78 proceeding in New York Supreme Court to nullify all construction approvals and permits rendered under the consent judgment. Judge Brieant removed the state claim pursuant to the All Writs Act and decided the merits of the Article 78 proceeding. Most significantly, at the conclusion of his opinion, Judge Brieant invoked the All Writs Act to permanently enjoin "plaintiffs, their successors and assigns and all persons with actual knowledge of the injunction from challenging in any forum, except on direct appeal in this case, the validity of the Permits issued pursuant to the Consent Judgment." *Lucas,* 7 F.Supp.2d at 329. The court explained that finality was needed to effect settlement, and that repetitious actions regarding the same claims would only prevent the expeditious resolution of litigation. We find Judge Brieant's formulation to be an appropriate one.

Accordingly, a permanent injunction shall hence forth issue in this case enjoining plaintiffs, their successors and assigns, and all persons with actual knowledge of the injunction from challenging in any forum the use of the Grassy Sprain site for housing purposes.[10]

**D. REMAND**

Plaintiffs have two remaining claims: one based on chapter 728 of New York's 1996 session laws, and another based on Act No. 64–1997 adopted by the Westchester County Board of Legislators on April 25, 1997. *See* Compl. at 17. Because resolution of these claims does not endanger this Court's remedial rulings in *U.S. v. Yonkers,* we remand them to New York Supreme Court for adjudication on the merits not inconsistent with this Opinion.

### III. CONCLUSION

For all of the foregoing reasons, the Court concludes that:

(1) Removal to this Court was both necessary and appropriate under the All Writs Act, 28 U.S.C. § 1651(a);

(2) Plaintiffs lack standing to sue as third-party beneficiaries to the Intermunicipal Agreement executed between the City and Westchester County–and thus Plaintiffs' contract cause of action must be dismissed by the Court, sua sponte, for failure to state a claim upon which relief can be granted;

(3) All Writs Act provides basis for the Court's issuance of a permanent injunction that henceforth enjoins Plaintiffs, their successors and assigns, and all persons with actual knowledge of the injunction, from challenging the use of the Grassy Sprain site for housing purposes; and

(4) Plaintiffs' two remaining state-law claims should be remanded to New York Supreme Court for further ad-

---

**10.** Our permanent injunction has three immediate effects on Plaintiffs: (1) it bars Plaintiffs from seeking rescission of the quitclaim deed conveying the County's reversionary interest in the Grassy Sprain site to Yonkers; (2) it bars Plaintiffs from seeking a declaratory judgment that the Grassy Sprain site may not be used for non-park purposes, including residential development; and (3) it defeats Plaintiffs' motion for a preliminary injunction to enjoin the City from utilizing the Grassy Sprain site "for any purpose which is not consistent with its status as public parkland."

judication not inconsistent with the Court's rulings herein.

SO ORDERED.